IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| MINISTER TIMOTHY LUTHER MCNAIR, | Case No. 2:16-cv-00871-SB |
| Plaintiff, | **FINDINGS AND RECOMMENDATION** |
| v. | |
| STATE OF OREGON, et al., | |
| Defendants. | |

**BECKERMAN, United States Magistrate Judge.**

Minister Timothy Luther McNair ("McNair"), a self-represented litigant, filed this action alleging constitutional and state law violations during McNair's incarceration at Snake River Correctional Institution ("SRCI"). The remaining defendants ("Defendants") now move for summary judgment (ECF No. 101), on the remaining claims.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1367. For the reasons explained below, the Court recommends that the district judge grant Defendants' motion for summary judgment and deny a series of motions filed by McNair.

PAGE 1 – FINDINGS AND RECOMMENDATION

**PROCEDURAL HISTORY**

McNair's original complaint included thirty-two claims for relief against forty-seven defendants. (ECF No. 2.)[1] On July 19, 2016, the Court dismissed McNair's original complaint for failure to comply with Fed. R. Civ. P. 8(a) and 10(b), and ordered McNair to file an amended complaint. (ECF No. 8.) On February 23, 2017, the Court dismissed McNair's amended complaint for failure to comply with Fed. R. Civ. P. 8(a) and 10(b), and ordered McNair to file an amended complaint. (ECF No. 21.) On March 27, 2017, McNair filed a third amended complaint. (ECF No. 33 ("TAC").)

On July 5, 2017, the Court dismissed from the TAC all claims against the State of Oregon, the Oregon Department of Corrections ("ODOC"), SRCI, and the Therapeutic Level of Care Committee ("TLC"). (ECF No. 34.) The Court dismissed McNair's excessive force claims relating to ankle chains (Claim Fourteen); relating to the design of the segregation unit (Claim Nineteen); and relating to a handcuffing incident (Claim Twenty-Three). The Court dismissed McNair's medical treatment claims relating to the diagnosis of McNair's injuries (Claim Seventeen); failing to fill a prescription (Claim Twenty); and grievance communications (Claims Twenty-Five and Twenty-Eight). The Court dismissed McNair's retaliation claims relating to his disciplinary segregation (Claim Nine, which the Court allowed to proceed against Sergeant Moore only); McNair feeling disrespected (Claim Twenty-Seven); denial of an opportunity to grieve (Claim Twenty-Nine); and for misconduct reports (Claim Thirty-Two). The Court dismissed McNair's due process claims (Claims Eight, Twenty-One, Thirty, and Thirty-One),

---

[1] McNair has filed sixteen actions in this Court in less than three years, and has now accumulated three "strikes" under the Prison Litigation Reform Act ("PLRA"), 28 U.S.C. §1915(g). *See McNair v. Darby*, No. 2:18-cv-00272-SB, Order (May 15, 2018) (denying McNair's application to proceed *in forma pauperis* in light of his history of filing meritless lawsuits).

PAGE 2 – FINDINGS AND RECOMMENDATION

and his conspiracy claims (Claims Seven, Twenty-Two, and Twenty-Six). On July 9, 2018, the Court also dismissed Claim Eighteen for lack of subject matter jurisdiction. (ECF No. 113.)

The claims that remain at issue are:

Claim One: Eighth Amendment claim relating to cell door closing

Claims Two, Three, Four, Eleven, Thirteen, and Fifteen: pendent state law claims

Claim Five: Eighth Amendment claim relating to response to cell door issue

Claim Six: First Amendment retaliation claim relating to filing grievance

Claim Nine: First Amendment retaliation claim relating to filing grievance

Claims Ten and Sixteen: Eighth Amendment claim relating to handcuffs

Claims Twelve and Twenty-Four: Eighth Amendment claim relating to medical care.

(ECF No. 33.)

The remaining defendants include the following ODOC personnel: John Carter ("Officer Carter"), a correctional officer at SRCI; Mark Nooth ("Administrator Nooth"), Eastside Institutions Administrator; Richard Moore ("Sergeant Moore"), a correctional sergeant at SRCI; James Harrison ("Officer Harrison"), a correctional officer at SRCI; Thomas McLay ("Security Manager McLay"), Institution Security Manager at Powder River Correctional Institution; Francisco Benitez ("Officer Benitez"), a correctional officer at SRCI; Colette Peters ("Director Peters"), ODOC director; John Doe ("Doe"), an unknown officer; and Ronda Wagner ("Nurse Wagner"), a registered nurse.

///
///
///
///

PAGE 3 – FINDINGS AND RECOMMENDATION

McNair's claims center on two alleged incidents — (1) being pinned by his closing cell door, resulting in injuries; and (2) being forcefully handcuffed, exacerbating his injuries — and the adequacy of the medical care he received to treat his injuries.[2]

## BACKGROUND[3]

On October 19, 2015, McNair was taken into ODOC custody. (Decl. Jason Bell Supp. State Defs.' Mot. Summ. J. 2, ECF No. 103 (hereinafter "Bell Decl.").) McNair was first housed at ODOC's intake facility at Coffee Creek Correctional Institution ("CCCI"). (Bell Decl. at 2.) On November 18, 2015, he was transferred to SRCI. (*Id.*) At all times relevant to McNair's claims, McNair was housed at SRCI. (*Id.*)

### Relevant Medical History

On October 19, 2015, McNair's first day in ODOC custody, McNair received a medical examination. (Decl. Christopher Diguilio, M.D., Supp. Defs.' Mot. Summ. J. 3, ECF No. 102 (hereinafter "Diguilio Decl.").) McNair listed in his screening report that he had a bulging disk in his neck, a torn ligament in his right shoulder, and numbness in his feet. (Diguilio Decl. at 3.) On October 20, 2015, McNair went to "sick call" at CCCI and reported joint pain and numbness in his toes and running down his left arm to his thumb. (*Id.*) He also reported that before entering custody he suffered a torn ligament, a punching injury, and a slip-and-fall accident. (*Id.*) McNair

---

[2] In his Opposition, McNair includes several new factual allegations that he did not include in his TAC. *See, e.g.,* Pl.'s Opp'n at 11-14 (alleging new theories of retaliation and discrimination). The Court will not consider new factual allegations raised for the first time in response to a motion for summary judgment. *See Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 965 (9th Cir. 2006) (finding that a district court need not address allegations raised for the first time in a response to a motion for summary judgment where the plaintiff's "pleadings did not provide sufficient notice of those allegations"); *see also Jacobsen v. Filler*, 790 F.2d 1362, 1364-65 (9th Cir. 1985) ("[P]ro se litigants in the ordinary civil case should not be treated more favorably than parties with attorneys of record.").

[3] Unless otherwise noted, the following facts are either undisputed or viewed in the light most favorable to McNair.

PAGE 4 – FINDINGS AND RECOMMENDATION

again went to sick call on October 27 and November 5, 2015, and reported neck and feet pain, which medical staff "noted for follow up" at McNair's next housing facility. (*Id.* at 4.)

### Cell Door Incidents

On December 14, 2015, McNair filed a Grievance Form against Officer Carter regarding an incident that occurred on November 29, 2015. (Bell Decl. at 9.) McNair reported that during line movements, Officer Carter opens and closes prisoners' cell or unit doors too quickly, and "[a]n inmate could possibly get hurt from try[ing] to dodge a steel door." (*Id.*) Officer Carter wrote an entry in McNair's Corrections Information Systems Report dated December 21, 2015, which stated that McNair's "door was almost closed when [he] saw him grab it from the inside and force it open." (*Id.* at 8.)

Officer Carter filed a Grievance Response Form on December 21, 2015, wherein he explained that he opens cell doors twice during line movements. (*Id.* at 10.) Prisoners may either enter or exit their cells during the first or second door opening. (*Id.*) The whole process lasts five minutes, but the doors do not stay open for those five minutes, as McNair believes they should. (*Id.*) Officer Carter further instructed that line movements occur at the same times every day, and McNair should be ready. (*Id.*) If McNair misses both openings, he should not jump through or interfere with the doors. (*Id.*) Instead, he may push an emergency buzzer to be let out. (*Id.*) Finally, Officer Carter wrote that on December 14, 2015, he asked Sergeant Moore to come to the unit to address McNair's concerns, and Sergeant Moore explained the door protocol to McNair at that time. (*Id.*)

On January 6, 2016, McNair filed a Grievance Appeal Form alleging that Officer Carter again had opened and closed the cell door too fast, this time pinning him in the doorway and

injuring his right shoulder and lower back. (*Id.* at 11.) McNair also wrote that Officer Carter does not announce line movements and that their times vary. (*Id.*)

On February 2, 2016, Administrator Nooth responded to McNair's grievance appeal, which Security Manager McLay investigated. (*Id.* at 12.) Administrator Nooth reiterated that cell doors are opened for thirty seconds at the beginning and end of line movements. (*Id.*) Administrator Nooth then wrote that, during an interview with Sergeant Moore, McNair had stated that his cell mate took too long to get through the door, so McNair tried to open the door while it was closing and hurt his shoulder and back in the process. (*Id.*) Such action constitutes tampering with a security device which is prohibited. (*Id.*) Administrator Nooth ended the letter by asking McNair to "refrain from attempting to alter the path of a moving door" in order to prevent injury to himself and damage to the door. (*Id.*)

McNair's records do not contain an Unusual Incident Report ("UIR") regarding McNair's cell door being closed on him (or any other unusual incident). (*Id.* at 3.) A UIR is typically filed when correctional officials use force. (*Id.*)

Jerry Stelling ("Stelling"), a maintenance and operations supervisor at SRCI, does not know of anyone who has sustained injuries by being pinned in a cell door. (Decl. Jerry Stelling Supp. State Defs.' Mot. Summ. J. 1, 2, ECF No. 104 (hereinafter "Stelling Decl.").) Stelling has worked at SRCI for more than eighteen years. (Stelling Decl. at 2.) The doors take three to four seconds to close. (*Id.* at 3.) An officer cannot stop a door while it is in the middle of opening or closing. (*Id.*) A door could close on a prisoner, but the prisoner could either stop the door with a foot or push the door open. (*Id.*) Stelling has let a door close on him without sustaining any injury and was able to push the door open. (*Id.*) Stelling is six feet and one inch tall and weighs approximately 240 pounds. (*Id.*) Jill Curtis ("Curtis"), a supervisory executive assistant to the

PAGE 6 – FINDINGS AND RECOMMENDATION

SRCI superintendent, has stood in front of a cell door that was closing and stopped the door with her foot. (Decl. Jill Curtis Supp. State Defs.' Mot. Summ. J. 1, 3, ECF No. 105 (hereinafter "Curtis Decl.").) She also has stood to the side of closing cell door and stopped the door by grabbing the door handle. (Curtis Decl. at 3.) Curtis is five feet and six inches tall and weighs approximately 145 pounds. (*Id.*) She did not incur any injuries from stopping the cell doors. (*Id.*)

McNair alleges that he is aware of several people who have been injured by the cell doors at SRCI, although he submits no evidence to support his allegation. (Pl.'s Opp'n at 4.) McNair acknowledges that he is aware that once the cell door is opening or closing, the guard is not able to stop the door. (Pl.'s Opp'n at 5.)

### Handcuffing Incident and Disciplinary Segregation

McNair alleges that on or about January 9, 2016, Sergeant Moore threatened him with disciplinary segregation as retaliation for filing grievances. (TAC at 6.) According to McNair's grievance history, he filed over 140 grievances between January 2015 and November 2017, the "vast majority" after January 2016. (Bell Decl. at 4.)

On January 13, 2016, McNair asked for grievance forms at the officer station and an officer told him to wait until the dayroom was open. (Bell Decl. at 4 and Ex. 4.) McNair allegedly said to his cellmate, "That Bitch won't give me my Grievance forms." (Bell Decl. Ex. 4 at 1.) McNair was written up for a violation of Disrespect III and taken to disciplinary segregation. (Bell Decl. Ex. 4 at 2.) An adjudicator found that he violated the Disrespect III rule, and imposed a time served (nine-day) sanction. (*Id.*)[4]

---

[4] McNair alleges that the hearings officer dismissed the charge (Pl.'s Opp'n at 7), but submits no evidence to support his allegation. On the contrary, the "Offender Misconduct History" he submits as Exhibit A-25 indicates that he was found in violation of Disrespect III on January 23, 2016, for his conduct on January 13, 2016. (Pl.'s Opp'n, Ex A-25 at 1.)

McNair alleges that Officer Harrison used excessive force when he placed McNair in handcuffs on January 13, 2016, in connection with the above incident. (TAC at 9.) McNair alleges that he suffered and continues to suffer bruises, scars, and numbness as a result of the handcuffs (Pl.'s Opp'n at 7), but he submits no evidence to support his allegations. There is no record of a UIR for the date in question. (Bell Decl. at 4.)

McNair had a medical appointment on the date of the alleged handcuff incident (January 13, 2016), as well as the following day. His medical records do not indicate that McNair reported or sought treatment for any alleged injuries resulting from handcuffs. (Diguilio Decl. at 9.) Instead, the medical records indicate that he sought treatment for a sore throat. (*Id.*) McNair alleges he told the nurse about his wrist injury on January 14, 2016 (Pl.'s Opp'n at 3), but he submits no evidence in support of his allegation.

### Subsequent Medical Treatment of McNair's Shoulder

On December 23, 2015, McNair received an MRI on his right shoulder, which showed "modest degeneration of the shoulder joints" but intact bones. (Diguilio Decl. at 4.)[5] On January 29, 2016, McNair received an MRI on his cervical spine to diagnose his neck pain. (*Id.*) On February 24, 2016, the TLC approved an MRI on McNair's right shoulder. (*Id.*) Dr. Hemphill (first name unknown) ("Dr. Hemphill"), one of McNair's treatment providers, requested the MRI after diagnosing McNair with a torn rotator cuff. (*Id.*)

On March 4, 2016, McNair had a follow-up appointment with Dr. Hemphill and complained of pain and difficulty getting to his top bunk. (*Id.*) Dr. Hemphill approved McNair for a bottom bunk. (*Id.*) On March 11, 2016, a community specialist at Saint Alphonsus Medical

---

[5] McNair disputes that an MRI was performed on December 23, 2015 (Pl.'s Opp'n at 2), but does not challenge the Imaging Center of Idaho medical records submitted by the Defendants noting the date of the imaging and the findings.

Center evaluated McNair's right shoulder. (*Id.* at 5.) The specialist determined that McNair's rotator cuff tear was not traumatic and recommended Theraband exercises and continued monitoring. (*Id.*) McNair had several follow-up appointments with Dr. Hemphill from March through May 2016. (*Id.*) At McNair's appointment on May 12, 2016, Dr. Hemphill prescribed hydrocodone to treat McNair's joint pain. (*Id.*) On June 8, 2016, the TLC approved two months of hydrocodone. (*Id.*) The TLC approved a tramadol prescription on June 15, 2016, and later continued it through January 2017. (*Id.* at 5-6.)[6]

McNair also had numerous medical appointments between June and August 2016, during which time he complained less about pain in his right shoulder. (*Id.* at 6.) At his appointment on August 11, 2016, McNair agreed to do range-of-motion exercises as recommended by a community specialist. (*Id.*) The nurse who saw McNair on August 19, 2016, recommended to the TLC that McNair receive an MRI of his spine and noted that McNair "ha[d] given up on the right shoulder" and instead wanted medical care for his neck pain. (*Id.*)

**Medical Treatment of McNair's Neck and Back**

The TLC approved the MRI of McNair's spine on August 24, 2016. (*Id.*) On December 22, 2016, McNair received the MRI, which showed degenerative disease of the cervical spine. (*Id.* at 7.) On February 8, 2017, the TLC approved a neuro-surgical consultation, which Dr. Hemphill had recommended after diagnosing McNair with cervical radiculopathy. (*Id.*) Cervical radiculopathy refers to "the damage or disturbance of nerve function that results if one of the nerve roots near the cervical vertebrae is compressed." (*Id.*)

On April 18, 2017, McNair saw Dr. Gregory Harrison ("Dr. Harrison") at St. Luke's Clinic in Boise, Idaho. (*Id.*) Dr. Harrison recommended surgery to treat McNair's cervical

---

[6] McNair disputes whether the pain medications were actually dispensed. (Pl.'s Opp'n at 2.)

PAGE 9 – FINDINGS AND RECOMMENDATION

radiculopathy and related symptoms. (*Id.*) The TLC approved the surgery on April 26, 2017. (*Id.*) SRCI medical staff continued physical therapy with McNair during May and June 2017. (*Id.* at 8.) On June 7, 2017, Dr. Harrison performed surgery on McNair at St. Luke's Clinic. (*Id.*) After the surgery, SRCI medical staff observed McNair in the SRCI infirmary, treated McNair's pain with Norco, gave McNair instructions for cleaning his surgical wound, and restricted McNair from lifting weights for three weeks. (*Id.*)

On June 11, 2017, McNair had a post-operative appointment with Dr. Harrison. (*Id.*) The medical records indicate that McNair reported that his pain was "definitely better" and he could move all of his extremities freely (*id.*), although McNair now alleges he was still in pain and continues to suffer from neck pain. (Pl.'s Opp'n at 3.) Dr. Harrison recommended that McNair not lift more than eight to ten pounds and avoid high impact activities for six weeks, after which time he could gradually engage in physical activity to the extent he was able. (*Id.*) McNair denied having any additional problems or concerns. (*Id.*) On August 18, 2017, McNair received an MRI on his spine, which showed an intact surgery site, normal alignment impressions, and stable degeneration. (*Id.*)

## ANALYSIS

### I. STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). On a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005). The court does not assess the credibility of witnesses, weigh evidence, or determine the truth of matters in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Where the record taken as a whole could not lead a rational trier of

PAGE 10 – FINDINGS AND RECOMMENDATION

fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

## II.     DISCUSSION

### A.     Eighth Amendment Claims

#### 1.     Excessive Force

To prevail on an Eighth Amendment claim based on the use of excessive force, a prisoner must demonstrate that the defendant acted maliciously and sadistically to cause harm. *See Hudson v. McMillian*, 503 U.S. 1, 7 (1992) (holding that "whenever prison officials stand accused of using excessive physical force. . . the core judicial inquiry is. . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm"). The amount of force required for a constitutional violation must be "repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 10.

##### a.     Cell Door (Officer Carter and Sergeant Moore)

McNair alleges that Officer Carter used excessive force when he closed the cell doors on December 21, 2015 and January 21, 2016, resulting in injury to McNair. McNair also alleges that Sergeant Moore did not respond appropriately when McNair reported his concerns about the first cell door incident.

McNair has not presented any evidence to suggest that Officer Carter intended to injure him by closing the cell door while he was standing in the doorway, nor that Officer Carter singled him out to close his door more quickly than those of other prisoners in his unit. Rather, McNair alleges only that Officer Carter generally does not leave enough time for prisoners to exit their cells when he closes the cell doors, and as a result, McNair was injured by the closing door on two occasions. The undisputed facts support a conclusion that a prisoner generally has sufficient time to exit his cell safely, and if he is unable to exit safely for whatever reason, he

PAGE 11 – FINDINGS AND RECOMMENDATION

may wait in his cell and request assistance. Even if the Court accepts as true McNair's allegation that he was pinned and injured by the closing cell door on the dates in question, McNair has submitted no evidence that Officer Carter (or Sergeant Moore) acted maliciously or sadistically to cause him harm. Rather, the record indicates that Officer Carter opened and closed the doors per his normal routine, and Sergeant Moore followed up with McNair to determine if he had resolved his cell door issues. Therefore, the district judge should grant Defendants' motion for summary judgment on McNair's excessive force claims relating to the cell doors.

### b. Handcuffs (Officer Harrison, Security Manager McLay, and Sergeant Moore)

McNair alleges that on January 13, 2016, Officer Harrison, acting under orders from Security Manager McLay and Sergeant Moore, used excessive force when handcuffing McNair, resulting in injury. Even if the Court accepts as true McNair's uncorroborated allegation that he sustained injuries as a result of the handcuffing, he has submitted no evidence to support a conclusion that Officer Harrison, Security Manager McLay, or Sergeant More acted maliciously or sadistically to cause him harm. *See Smith*, 578 F. App'x at 722 (affirming summary judgment because there was no genuine issue of fact as to whether the officer acted maliciously and sadistically to cause harm when handcuffing and removing the plaintiff from his cell). In addition, McNair had a medical appointment on the date of the handcuffing, as well as the following day, and his medical records do not indicate that he mentioned any hand or wrist injuries at that time, nor were any injuries documented in his medical record. Although McNair alleges that he continues to suffer from bruising, scarring, and numbness as a result of the January 13, 2016, handcuffing incident, he has presented no medical evidence to support his allegation. The district judge should grant Defendants' motion for summary judgment on McNair's excessive force claim relating to the January 2016 handcuffing.

PAGE 12 – FINDINGS AND RECOMMENDATION

### 2. Inadequate Medical Care

To prevail on an Eighth Amendment claim for the denial of adequate medical care, a prisoner must demonstrate that the defendant acted with deliberate indifference to a serious medical need. *Egberto v. Nevada Dep't of Corr.*, No. 13-16055, 2017 WL 476577, at *1 (9th Cir. Feb. 6, 2017). "A medical need is serious if failure to treat it will result in significant injury or the unnecessary and wanton infliction of pain." *Peralta v. Dillard*, 744 F.3d 1076, 1081, 1086 (9th Cir. 2014) (internal quotations omitted). "A prison official is deliberately indifferent to that need if he knows of and disregards an excessive risk to inmate health." *Id.* (internal quotations omitted); *Egberto*, 2017 WL 476577, at *2; *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014). "This indifference can be 'manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.'" *Egberto*, 2017 WL 476577, at *2. Proof of deliberate indifference requires more than ordinary lack of due care. *Id.; Colwell*, 763 F.3d at 1066; *Williams v. Nevada*, 675 F. App'x 768, 768 (9th Cir. 2017).

McNair alleges that on January 27, 2016, Administrator Nooth was made aware of McNair's two torn shoulder ligaments, numbness from his neck injury, and lower back issues, but ignored McNair's serious medical needs.[7] On the contrary, the undisputed facts show that the TLC approved an MRI of McNair's shoulder, McNair had several follow-up appointments, was prescribed pain medication and physical therapy, and eventually stopped complaining about shoulder pain. With respect to McNair's neck and back pain, the TLC approved an MRI of McNair's spine in August 2016, approved a neurosurgical consultation in February 2017, approved surgery in April 2017, and SRCI medical staff cared for McNair following surgery. At

---

[7] McNair also alleged more generally in Claim Twelve that prison officials have not provided him with adequate medical care since December 2015. (TAC at 10.)

PAGE 13 – FINDINGS AND RECOMMENDATION

McNair's June 2017 post-operative appointment, McNair reported he was feeling better, and an August 2017 MRI confirmed an intact surgery site, normal alignment impressions, and stable degeneration.[8] McNair has submitted no evidence to demonstrate that any defendant was deliberately indifferent to his serious medical needs, and therefore the district judge should grant Defendants' motion for summary judgment on McNair's deliberate indifference claims.

### B.    First Amendment Retaliation Claims

McNair alleges that at a January 13, 2016, meeting with Sergeant Moore, Sergeant Moore ordered McNair to segregation for calling a prison official a "bitch." (TAC at 8.)[9] McNair argues that Moore punished him in retaliation for McNair's prior grievances.

In order to prove a First Amendment retaliation claim, a plaintiff must present evidence giving rise to a reasonable inference that (1) he engaged in constitutionally protected conduct; (2) the defendants took adverse action against him; (3) a causal connection exists between the adverse action and the protected conduct; (4) the defendants' acts would chill or silence a person of ordinary firmness (i.e., the acts caused more than minimal harm); and (5) the defendants' retaliatory action did not advance legitimate goals of the institution. *Watison v. Carter*, 668 F.3d 1108, 1114-15 (9th Cir. 2012); *Jones v. Williams*, 791 F.3d 1023, 1035 (9th Cir. 2015). Courts must evaluate retaliation claims brought by prisoners in light of concerns over "excessive

---

[8] McNair asserts for the first time in his opposition that the surgeon performed surgery on the right side of his back despite a diagnosis from his prior physician that he suffers from left radiculopathy. However, McNair's medical records indicate that the TLC approved a left side radiculopathy. (DiGuilio Decl. Ex. 2.)

[9] McNair also alleges that on January 9, 2016, Sergeant Moore offered to send him to administrative segregation while his grievance against Officer Carter was under review, and that McNair agreed to go to segregation because Sergeant Moore made him feel uncomfortable. (TAC at 6). McNair cannot sustain a retaliation claim where he agreed to be placed in administrative segregation. In any event, this claim fails for the same reasons as his other retaliation claim.

PAGE 14 – FINDINGS AND RECOMMENDATION

judicial involvement in day-to-day prison management, which 'often squander[s] judicial resources with little offsetting benefit to anyone.'" *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995) (*quoting Sandin v. Conner*, 515 U.S. 472, 482 (1995)). In particular, courts should "'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." *Id.* (*quoting Sandin*, 515 U.S. at 482).

In reference to the second and third elements, retaliatory motive, a plaintiff must show that his protected activities were a "substantial" or "motivating" factor behind defendant's conduct. *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009). In addition to demonstrating defendant's knowledge of plaintiff's protected conduct, circumstantial evidence of motive may include: (1) proximity in time between the protected conduct and the alleged retaliation; (2) defendant's expressed opposition to the protected conduct; and (3) other evidence showing that defendant's reasons for the challenged action were false or pretextual. *McCollum v. California Dep't of Corr.*, 647 F.3d 870, 882 (9th Cir. 2011) (*quoting Allen v. Iranon*, 283 F.3d 1070, 1077 (9th Cir. 2002)).

McNair believes that Sergeant Moore retaliated against him by charging him with a minor rule violation in retaliation for McNair's prior grievances. To survive summary judgment, McNair must provide direct or circumstantial evidence of Sergeant Moore's alleged retaliatory motive. Here, the hearings officer found that McNair had violated the Disrespect III rule, and McNair does not dispute that he called the officer a "bitch." Rather, he appears to dispute whether prisoners are usually punished for calling correctional officials derogatory names, but he cites no evidence that other prisoners have used such language without consequence. McNair's speculation that Moore acted out of retaliation is not sufficient to survive summary judgment. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) ("[T]his court has

refused to find a 'genuine issue' where the only evidence presented is 'uncorroborated and self-serving' testimony.") (citation omitted).

McNair is unable to create a genuine issue of fact as to the second and third elements of his retaliation claims,[10] and therefore the district judge should enter judgment for Defendants on McNair's First Amendment retaliation claims.

### C. State Claims

McNair also alleges several state tort claims relating to the same events, including intentional infliction of emotional distress, assault, battery, and negligence. Defendants move to dismiss these tort claims because McNair failed to provide notice of his claims as required by the Oregon Tort Claims Act ("OTCA").

The OTCA requires that a plaintiff provide notice of a tort claim to the relevant public body within 180 days of the date a plaintiff knows, or should know, that "he or she has suffered some harm and knows that it is the result of tortious conduct." Or. Rev. Stat. § 30.275(2)(b). In his response, McNair does not allege that he provided notice or that he was excused from doing so, and instead argues only that the OTCA does not require a tort claim notice prior to filing *federal* claims. McNair has not sustained his burden of proving proper and timely notice of his state tort claims. *See* Or. Rev. Stat. § 30.275(7) ("In an action arising from any act or omission of a public body or an officer, employee or agent of a public body . . . , the plaintiff has the burden of proving that notice of claim was given as required by this section.").

The Court finds that McNair failed to comply with the OTCA's mandatory notice provision, and therefore the district judge should enter judgment for the Defendants on McNair's state tort claims. *See Gonzales v. Blanton*, 504 F. App'x 635, 636-37 (9th Cir. 2013) ("The

---

[10] In addition, nine days in segregation had no chilling effect on McNair's speech, as he continued to file many grievances and lawsuits following this incident.

PAGE 16 – FINDINGS AND RECOMMENDATION

district court properly granted summary judgment on Gonzales' state law claims for negligence and intentional infliction of emotional distress because Gonzales failed to comply with the Oregon Tort Claims Act's mandatory notice provisions.").

### III. OTHER MOTIONS

McNair filed a motion for entry of judgment on the pleadings (ECF No. 97) upon receipt of Defendants' answer, asking for relief "as a consequence of the defendant's 'non-opposition[']' answer." McNair again filed a motion for entry of judgment on the pleadings (ECF No. 131) at the conclusion of briefing on Defendants' motion for summary judgment. *See* Fed. R. Civ. P. 12(c) ("After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."). For the reasons discussed above, McNair is not entitled to judgment on any of his claims and the district judge should deny the motions.

McNair also filed a request for entry of default and a motion for default judgment (ECF Nos. 119 and 120) on the ground that Defendants failed timely to file a reply in support of their motion for summary judgment. McNair filed his opposition on July 9, 2018, and Defendants filed their opposition fourteen days later, on July 23, 2018. Defendants timely filed a reply, but even if they had not, a reply brief is not required and the failure to file a reply is not grounds for entry of default judgment. The district judge should deny McNair's motions for entry of default and for default judgment.

McNair also filed a motion for an expert witness (ECF No. 107). The Court deferred a ruling on McNair's motion pending consideration of Defendants' motion for summary judgment, and has now determined that expert testimony is not necessary to resolve the issues presented herein. Accordingly, the Court denies McNair's motion for an expert witness.

## CONCLUSION

Based on the foregoing, the Court recommends that the district judge GRANT Defendants' motion for summary judgment (ECF No. 101), DENY McNair's motions for entry of judgment on the pleadings (No. 97 and No. 131), and DENY McNair's motions for entry of default and default judgment (ECF Nos. 119 and 120). This Court DENIES McNair's motion for an expert witness (ECF No. 107).

## SCHEDULING ORDER

The Court will refer its Findings and Recommendation to a district judge. Objections, if any, are due within fourteen (14) days of service of the Findings and Recommendation. If no objections are filed, the Findings and Recommendation will go under advisement on that date. If objections are filed, a response is due within fourteen (14) days. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 4th day of February, 2019.

*Stacie F. Beckerman*

STACIE F. BECKERMAN
United States Magistrate Judge